1
2
3
4
5
6
7
8
9                    UNITED STATES DISTRICT COURT

10              FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,          )   Case No. CR 01-00209(C) DOC
                                       )
13                  Plaintiff,         )   ORDER DENYING DEFENDANTS'
                                       )   MOTIONS NO. 1, 2, AND 11.
14            vs.                      )
                                       )
15  1) HOSSEIN KALANI AFSHARI          )
    2) MOHAMMAD HOSSEIN OMIDVAR        )
16  3) HASSAN REZAIE                   )
    4) ROYA RAHMANI                    )
17  5) NAVID TAJ                       )
    6) MOUSTAFA AHMADY                 )
18  7) ALIREZA MOHAMMADMORADI          )
                                       )
19                  Defendants.        )
                                       )
20  _____   )

21

22        This matter has come before the Court on: Defendants' Motion to Dismiss Counts

23  59-117 for Violating the *Ex Post Facto* Clause and Being a Bill of Attainder, Defendants'

24  Motion to Dismiss No. 1; Defendants' Motion to Dismiss Counts 59-117 Pursuant to the First

25  and Sixth Amendments, Defendants' Motion No. 2; and Defendants' Motion to Dismiss Counts

26  60-82 for Alleging Only Solicitation but not Material Support, Defendants' Motion No. 11,

27  filed by Defendants Roya Rahmani, Alireza Mohammadmoradi, Moustafa Ahmady, Hossein

28  Kalani Afshari, Hassan Rezaie, Navid Taj, and Mohammad Hossein Omidvar ("Defendants").

                                       1

Counts 59-117 (the "material support counts") of the Second Superseding Indictment (the "Indictment"), charge Defendants with providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B.  Having considered the record herein, including oral argument, the Court finds as follows:

***Facts and Procedural History***[1]

The Indictment alleges that beginning on October 8, 1997 though February 27, 2001, Defendants provided material support to the Mujahedin-e Khalq ("MEK") by soliciting donations from unwitting donors at airports, such as the Los Angeles International Airport ("LAX") and other public places, and by making financial contributions to the MEK.[2] According to the Indictment, Defendants knowingly combined, conspired, and agreed to provide material support and resources to the MEK knowing that the MEK had been designated as a foreign terrorist organization ("FTO").[3]

Specifically, the Indictment alleges that Defendants Rahmani, Mohammadmoradi, Ahmady, Afshari, Rezaie, Taj and Omidvar, knowingly combined, conspired, and agreed to provided material support to a foreign terrorist organization by soliciting contributions on behalf of the MEK.  Indictment ¶ 69.  The Indictment alleges that Defendant Rahmani was the leader of the Los Angeles MEK cell, and directed fundraising activities and solicited donations for the MEK from various individuals.  Indictment ¶ 19.  It also alleges that the fund-raising activities in the Central District of California were organized and controlled by a Los Angeles-based designated cell leader, that the Los Angeles cell leader received directions and guidance from the MEK about MEK activities in the Los Angeles area, and that as the cell leader, Defendant Rahmani communicated with MEK leadership, Indictment ¶ 35.  The Indictment

---

[1]  As the facts and procedural history are well known to the parties, the Court will recite only those facts that are pertinent to the underlying motions.

[2]  In ruling on a pre-trial motion to dismiss an indictment, a court assumes the truth of the of allegations in the indictment.  *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

[3]  Unless otherwise stated, all factual references are as alleged in the Indictment.

1    further alleges that some of the Defendants solicited donations from unwitting donors at LAX.

2    Indictment ¶ 36.  In soliciting donations, Defendants claimed to unwitting donors that they

3    were raising money for victims of natural disasters, victims of torture, orphans, refugees, or

4    starving children, when in fact, as they knew, they were raising money for the MEK.  Some of

5    the Defendants donated money to the MEK.

6          The MEK, also known as the People's Mojahedin Organization of Iran (the "PMOI"),

7    and the National Council of Resistance of Iran (the "NCRI") controlled a number of terrorist

8    training camps and bases inside Iraq.  The MEK also produced television programs, which

9    were edited in Los Angeles, using footage obtained at the MEK camps inside Iraq and which

10   solicited people to join the MEK.  The MEK also published and distributed a newspaper called

11   the "Mojahed," which reported on the activities of the MEK.  The MEK used the money

12   obtained from fundraising efforts, including those from Defendants, to fund the operations and

13   activities of the MEK, including its terrorist activities.

14         In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996

15   ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214-1319 (1996) in order to inter alia, address

16   concerns regarding international terrorism.  The statute which Defendants are charged with

17   violating, 18 U.S.C. § 2339B, was designed to cut off monetary and other support for such

18   terrorist activities by prohibiting persons from knowingly providing material support and

19   resources to foreign terrorist organizations. 18 U.S.C. § 2339B (1996).  The AEDPA

20   "conferr[s] upon the Secretary of State the power to designate "foreign terrorist organizations"

21   ("FTO").  *People's Mojahedin Organization of Iran v. Dept's of State* (*"PMOI I"*), 182 F.3d

22   17, 18-19 (1999).  The designation of an organization as an FTO lasts two years.

23         On October 8, 1997, the Secretary of State Madeline K. Albright designated the MEK as

24   a Foreign Terrorist Organization.  *PMOI I*, 182 F.3d at 18.  In 1999, the MEK challenged the

25   designation before the Court of Appeals in the District of Columbia.  *Id*.  Although the D.C.

26   Circuit found that the MEK, "[a] foreign entity without property or presence in this country had

27   no constitutional rights, under the due process clause or otherwise," the D.C. Circuit concluded

28   that the record before the Secretary of State contained "substantial support for her findings"

1   that the MEK was an FTO.  *Id*. at 24-25.  The D.C. Circuit "refuse[d] to set aside . . . [the]
2   designation. *Id*.

3         On October 8, 1999, the Secretary designated the MEK as an FTO for the following two
4   years, and added the National Council of Resistance of Iran ("NCRI") as an alias or alter ego of
5   the PMOI.  *National Council of Resistance of Iran ("NCRI") v. Dep't of State*, 251 F.3d 192,
6   197 (2001).   Because the D.C. Circuit found that the MEK, unlike before, had presence in the
7   United States, the D.C. Circuit found that while "the designation was in compliance with the
8   statute, . . . the statute does violate the due process rights of the [MEK] under the Fifth
9   Amendment"  *NCRI* at 196.  The D.C. Circuit, however, did not "order the vacation of the
10  existing designations, but rather remand[ed] the questions to the Secretary with instructions
11  that the [MEK] be afforded" the due process the D.C. Circuit found was due to the
12  organization.  *Id*. at 209.

13        In June 21, 2002, the Honorable Robert M. Takasugi, District Court Judge, granted
14  Defendants' motion to dismiss an indictment charging Defendants with the same counts as are
15  the subject of the present motions.  *United States v. Rahmani*, 209 F.Supp.2d 1045 (2002).
16  Judge Takasugi found that the statute establishing the procedure whereby an organization is
17  designated by the Secretary of State as a "foreign terrorist organization" was facially
18  unconstitutional under the Due Process Clause of the Fifth Amendment.  On appeal, the Ninth
19  Circuit reversed Judge Takasugi and remanded the matter for further proceedings.  *United*
20  *States v. Afshari,* 426 F.3d 1150 (2005) . On November 27, 2007, the Government filed the
21  Indictment, realleging the material support counts.

22        On February 23, 2009, the case was transferred to this Court.

23        ***The Relevant Statutory Framework***

24        Under the AEDPA, the Secretary of State is authorized to designate an organization as
25  an FTO if it is a foreign organization that engages in a terrorist activity that threatens the

26

27

28

security of United States nationals or the national security of the Untied States.[4]

Judicial review of a designation may be had only in the Court of Appeals for the District of Columbia ("D. C. Circuit") and only the organization itself may challenge the designation.[5] Under 8 U.S.C. § 1189(b), if judicial review is sought, the D.C. Circuit is to review the administrative record, including *ex parte* and *in camera* classified information submitted by the Government, to determine if the court finds the Secretary of State's designation to be –

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right;

(D) lacking substantial support in the administrative record taken as a whole or in

---

[4] 8 U.S.C. § 1189(a)(1) reads:

The Secretary is authorized to designate an organization as a foreign terrorist organization In accordance with this subsection if the Secretary finds that --

(A) the organization is a foreign organization;

(B) the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title); and

(C) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States.

18 U.S.C. § 1189(a)(1) (West 1996).

[5] 8 U.S.C. § 1189(b) reads, in relevant part:

(1)  Not later than 30 days after publication of the designation in the Federal Register, an organization designated as a foreign terrorist organization may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit.

(2) Review under this subsection shall be based solely upon the administrative record, except that the Government may submit, for *ex parte* and *in camera* review, classified information used in making the designation.

8 U.S.C. § 1189(b) (West 1996).

1    classified information submitted to the court under paragraph (2),[6] or

2    (E) not in accord with the procedures required by law.

3    8 U.S.C. § 1189(b) (3) (West 1996).

4    A designation "shall take effect upon publication" in the Federal Register, 8 U.S.C. §

5    1189(a)(2)(B)(i), and for purposes of a prosecution for providing material support, "a defendant

6    in a criminal action shall not be permitted to raise any question concerning the validity of the

7    issuance of such designation as a defense or an objection at any trial or hearing."  8 U.S.C. §

8    1189(a)(8).

9    At all times relevant to the Indictment, the AEDPA provided that:

10   Whoever, within the United States or subject to the jurisdiction of the United States,

11   knowingly provides material support or resources to a foreign terrorist organization, or

12   attempts or conspires to do so, shall be fined under this title or imprisoned not more than

13   10 years, or both.

14   18 U.S.C.A. § 2339B (West 1996) (effective April 24, 1996 to October 25, 2001).

15   The AEDPA further defined "material support or resources" by referencing 18 U.S.C. §

16   2339A,which in turn, stated that,

17   [i]n this section, the term material support or resources means currency or other

18   financial securities, financial services, lodging, training, safehouses, false

19   documentation or identification, communications equipment, facilities, weapons, lethal

20   substances, explosives, personnel, transportation, and other physical assets, except

21   medicine or religious materials.

22   18 U.S.C.A. § 2339A(b) (West 1996) (effective October 11, 1996 to October 25, 2001).

23   On October 26, 2001, Congress enacted the Uniting and Strengthening America by

24   Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act, otherwise

25   known as the USA PATRIOT Act, which broadened the AEDPA's definition of "material

26   support or resource" to add a prohibition from providing "expert advice or assistance," 18

27   
28   

6

U.S.C. § 2339A,[7] and increased the punishment for violating Section 2339B to a "fine under this title or imprisonment not more that 15 years, or both, and if the death of any person results, shall be imprisoned for any term of years or for life.  18 U.S.C. § 2339B (West 2001) (effective October 26, 2001 to December 16, 2004).

On December 17, 2004, Congress enacted the Intelligence Reform and Terrorism Prevention Act (the "IRTPA"),which amended Section 2339B to provide that,

(a) (1) Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C.A. § 2339B (West 2004) (effective December 12, 2004).

The amendment further provides that,

---

[7] 18 U.S.C. § 2339A provided that:

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

18 U.S.C.A. § 2339A (b) (West 2004 (effective December 17, 2004 to March 8, 2006).

7

(h) No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

(i) Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.

(j) No person may be prosecuted under this section in connection with the term "personnel", "training", or "expert advice or assistance" if the provision of that material support or resources to a foreign terrorist organization was approved by the Secretary of State with the concurrence of the Attorney General. The Secretary of State may not approve the provision of any material support that may be used to carry out terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act).

*Id.*

The IRTPA also amended the terms "training," "personnel," "expert advice or assistance" and added the term "service" to the definition of "material support or resources" as follows:

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

1    (3) the term "expert advice or assistance" means advice or assistance derived from

2    scientific, technical or other specialized knowledge.

3  18 U.S.C. § 2339A (West 2004) (effective December 17, 2004 to March 8, 2006).

4  ***Defendants' Motion to Dismiss Counts 59-117 for Violating the Ex Post Facto Clause and***

5  ***Being a Bill of Attainder, Defendants' Motion to Dismiss No. 1***

6       Defendants argue Counts 59-117 should be dismissed because these counts charge

7  Defendants with providing material support to a designated FTO during a period of time when

8  that designation was unconstitutional, and that the Secretary of State in 2001 effectively

9  retroactively redesignated the MEK as an FTO from 1999 to 2001 in blatant violation of the *Ex*

10  *Post Facto* Clause and in what amounted to a bill of attainder.  As the Government argued in

11  its opposition papers and during oral arguments rather than retroactively designating the MEK

12  as an FTO, the Secretary of State – in both 1997 and 1999– designated the MEK as an FTO.  In

13  *Afshari*, the Ninth Circuit found at all relevant times, the "foreign terrorist organization"

14  designation had been in full force.  *Afshari*, 426 F.3d at 1157.  Although Defendants argue that

15  neither the Ninth Circuit nor the D.C. Circuit envisioned the repercussions that not vacating the

16  1999 designation would have on criminal prosecutions, the Court finds that the D.C. Circuit

17  contemplated precisely those repercussions when, in 2003, it asked the parties to brief the

18  possibility "that the 1999 designation was moot."  *People Mojahedin Organization of Iran v.*

19  *Dep't of State*, 327 F.3d 1238, 1244 n.2 (D.C. Cir. 2003).  Because in *Afshari*, the Ninth Circuit

20  was precisely addressing this case, the Ninth Circuit was obviously aware of the repercussions

21  of its decision not to contradict the D.C. Circuit in this criminal prosecution.

22       The Government frames the 2001 actions by the Secretary of State as a decision "to

23  leave in place" the 1999 designation.  Defendants frame the same action as a "redesignation" –

24  a word the *Afshari* Court itself uses when referring to the Secretary's actions following remand

25  from the D.C. Circuit.  However that action is framed, because Defendants are charged with

26  providing material support to an FTO during the time when the 1997 and the 1999 designations

27  were in effect.  The Secretary's actions of 2001 did not change the designations that are

28  applicable to the instant case, that is the 1997 and 1999 designations, which do not present

1  neither *an ex post facto* concern, nor a bill of attainder.  Defendants' Motion to Dismiss No. 1

2  is therefore denied.

3

4  ***Defendants' Motion to Dismiss Counts 59-117 Pursuant to the First and Sixth Amendments,***

5  ***Defendants' Motion No. 2***.

6          Defendants argue that Counts 60-82 should be dismissed as violating the First

7  Amendment.  More specifically, Defendants argue that Counts 60-82 are unconstitutionally

8  vague under the Fifth Amendment because the term "personnel" in effect in the AEDPA at the

9  time the conduct alleged in the Indictment took place (1) did not provide notice to the

10  Defendants that they could engage in protected First Amendment solicitation without offending

11  Section 2339B and (2) encompassed a substantial amount of activity that is protected by the

12  First Amendment.

13          In a similar vein, Defendants argue that Counts 83-117 should be dismissed because the

14  Indictment charges Defendants with engaging in advocacy protected under the First

15  Amendment, which cannot be forbidden or proscribed except when "such advocacy is directed

16  to inciting or producing imminent lawless action and is likely to incite or produce such action"

17  under *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) and its progeny.  Defendants argue that

18  because the Indictment fails to allege that Defendants' financial contributions to the MEK

19  constitute incitement of imminent lawless actions an element that Defendants argue must be

20  found by a jury as required by *Brandenburg* and *Ring v. Arizona*, 536 U.S. 584, 606-07 (2002)

21  Counts 83-117 should be dismissed as violating Defendants' Sixth Amendment's right to a jury

22  trial as to all elements of the crime at issue.

23          ***Prosecution Under the AEDPA's and the IRTPA's Definition of "personnel."***[8]

24          Defendants argue that they cannot be prosecuted under the AEDPA's definition of

25

─────────────────────

26          [8]  During oral arguments, the Government stated that with respect to the fund raising

27  efforts by Defendants, the Government is alleging two theories: providing material support by

28  providing money and by providing personnel.

"personnel"because that term was found unconstitutionally vague in *Humanitarian Law Project v. Reno* ("*HLP I*"), 205 F.3d 1130, 1137 (9th Cir. 2000).  *HLP I*, however, entailed an as-applied challenge.  The *HLP I* Court found that the term "personnel," as-applied to those independently advocating the lawful causes of FTOs, was unconstitutionally vague.  *HLP I*, 205 F.3d at 1137.  In *HLP I*, the court found:

> It is easy to see how someone could be unsure about what AEDPA prohibits with the use of the term 'personnel,' as it blurs the line between protected expression and unprotected conduct. . . . Someone who advocates the cause of the PKK could be seen as supplying them with personnel; it even fits under the government's rubric of freeing up resources, since having an independent advocate frees up members to engage in terrorist activities instead of advocacy.  But advocacy is pure speech protected by the First Amendment.

*Id*. (internal citations omitted); *See Humanitarian Law Project v. Ashcroft*, 309 F.Supp.2d 1185, 1199 (C.D. Cal., 2004) (recognizing that the issue reviewed by *HLP I* entailed an as-applied challenge).

Because the AEDPA's definition of the term "personnel" has not been found to be facially vague, the Defendants must either mount their own as-applied challenge to the AEDPA definition of 'personnel,'or show that the AEDPA definition of 'personnel' is facially unconstitutionally vague.

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . .  Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the Supreme Court has] recognized . . . that the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen,

11

1    prosecutors, and juries to pursue their personal predilections.

2    *Kolender v. Lawson*,  461 U.S. 352, 357-358 (1983).

3        "When a criminal law implicates First Amendment concerns, the law must be

4    'sufficiently clear so as to allow persons of ordinary intelligence a reasonable opportunity to

5    know what is prohibited.' " *HLP I*, 205 F.3d at 1137 (citing *Foti v. City of Menlo Park*, 146

6    F.3d 629, 638 (9th Cir.1998) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108

7    (1972))); *California Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001)

8    ("To trigger heightened vagueness scrutiny, it is sufficient that the challenged statute regulates

9    and potentially chills speech which, in the absence of any regulation, receives some First

10   Amendment protection.").  When a statute does not involve First Amendment freedoms,

11   however, a vagueness challenge "must be examined in the light of the facts of the case at

12   hand." *Foti*,  146 F.3d at 639 n.10 (quoting *Village of Hoffman Estates v. Flipside, Hoffman*

13   *Estates, Inc.*, 455 U.S. 489, 495 n. 7 (1982)).  This is so because "one to whose conduct a

14   statute clearly applies may not successfully challenge it for vagueness."  *Parker v. Levy*,  417

15   U.S. 733, 756 (1974).[9]

16       Although Defendants argue that the Indictment charges Defendants with violating

17   Section 2339B by engaging in activities at the core of the First Amendment, the Indictment

18   does not charge Defendants with conduct or speech involving First Amendment freedoms.  The

19   Indictment does not allege that Defendants "issued press releases and announcement about

20   MEK terrorist activities," Indictment ¶ 2; nor does it allege that Defendants "produced

21   television programs,"and  edited such programs which, among other things, "solicited people to

22   join the MEK," *Id*. ¶ 4, nor does it allege that Defendants "published and distributed" a

23   newspaper called the "Mojahed."  *Id*. ¶ 5.  The Indictment alleges that the MEK, rather than

24   Defendants, engaged in such activity.  In relation to the term 'personnel,' the Indictment

25

26   ───────────────

27       [9]  In the Ninth Circuit, there is some conflicting authority as to when a party has standing
     to challenge a statute as facially vague.  *See United States v. Adams*, 343 F.3d 1024, 1035 n. 15

28   (9th Cir. 2003) (noting tension in jurisprudence).

1    charges Defendants with fundraising, under the direction and control of the MEK, at LAX on

2    behalf of the MEK, an FTO, knowing that the MEK had received such designation.

3          In *HLP I*, the Ninth Circuit upheld a preliminary injunction prohibiting the Government

4    from prosecuting parties for providing material support to an FTO by providing personnel

5    when the parties intended to advocate independently on behalf of certain FTOs.  *HLP I*, 205

6    F.3d at 1137-38.  Unlike the parties involved in *HLP I*,  according to the facts alleged in the

7    Indictment, it is the MEK, rather than Defendants, that engaged in pure advocacy which absent

8    its designation as an FTO, may have been protected.  Instead, Defendants are charged with

9    assisting the MEK to conduct its fundraising activities in Los Angeles, under the direction and

10   control of the MEK.  Because as applied to Defendants, the AEDPA does not "blur[] the line

11   between protected expression and unprotected conduct," they may not successfully challenge

12   the AEDPA for vagueness."  *HLP I*, 205 F.3d at 1137.  Similarly, because the Indictment does

13   not allege that Defendants violated Section 2339B by engaging in protected advocacy, the

14   Indictment need not allege nor need the Government prove at trial, that Defendants' conduct

15   incited or produced imminent lawless action and that it was likely to incite or produce such

16   action under *Brandenburg v. Ohio* and its progeny.[10]

17

18          [10]  The Court notes that, as Defendants argue, the Government seems to take a narrower

19   view of what constitutes material support when the United States acts in the foreign policy arena

20   for purposes of discovery of materials the court considers to have an impact on sentencing.

21   While the Court would not go as far as Government counsel suggested during oral arguments,

22   the Court recognizes that the executive branch may act in the foreign policy arena in ways the

23   government prohibits a private individual to act. *See People Mojahedin Organization of Iran v.*

24   *Dep't of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003) (holding that whether the PMOI threatens

25   the security of the United States or its nationals, one of the findings the Secretary of State is

26   required to make in order to designate an organization as a foreign terrorist organization under 8

27   U.S.C. § 1189(a)(1)(C), is non-justiciable because "it is beyond the judicial function for a court

28   to review foreign policy decisions of the Executive Branch.") (citing *Chicago & Southern Air*

29   *Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948)).  For sentencing purposes,

30   however, how the United States has acted in relation to a foreign terrorist organization in the

Defendants also argue that they cannot be prosecuted under the IRTPA version of the term "personnel" because the IRTPA amendment post dates the alleged conduct attributed to Defendants.  While the Court agrees that Defendants may be prosecuted for providing personnel under the direction or control of the MEK as alleged in the Indictment, the Court rejects the theory advanced by the Government that because the IRTPA amendment is a "clarifying" amendment, it may be used retroactively.[11]

In *HLP I*, after finding that as-applied to the Plaintiffs in that case, the term "personnel" was vague, the court refused to read into the statue, "[i]n order to keep the statute from trenching on such advocacy . . . a requirement that the activity prohibited be performed 'under the direction or control' of the foreign terrorist organization."  *HLP I*, 205 F.3d at 1137.  The court rejected the Government's proposed construction, stating:

> While we construe a statute in such a way as to avoid constitutional questions, *see Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932), we are not authorized to rewrite the law so it will pass constitutional muster, *see Swain v. Pressley*, 430 U.S. 372, 378-79 n. 11, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977); *see also United States v. United States Dist. Court for the Cent. Dist. of Cal.*, 858 F.2d 534, 542 (9th Cir.1988) ("[A]lthough we may strain to construe legislation so as to save it against constitutional attack, we must not and will not carry this to the point of perverting the purpose of a statute or judicially rewriting it.") (citations and internal quotation marks omitted).

---

foreign policy arena may influence the  "overarching statutory charge for a district court to impose a sentence sufficient,  but not greater than necessary" to reflect the goals of 18 U.S.C. § 3553.  *United States v.Carty,* 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*).

[11]  In 2001, as part of the US PATRIOT ACT, Congress increased the statutory maximum to which a person may be subject for providing material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B from 10 years to 15 years.  Although neither Defendants nor the Government address the increased punishment, the Court finds that the statutory maximum applicable to Defendants, in the event of a conviction, is 10 years.

1    *HLP I*, 205 F.3d at 1137 -1138.

2           In enacting IRTPA, the Congress did what the Ninth Circuit could not do, it rewrote the

3    statute to save it against constitutional attacks.  Moreover, IRTPA's amendment seems to go

4    further than what *HLP I* suggested was necessary to save the statute.  Whereas *HLP I* suggested

5    that Congress could constitutionally prohibit an individual from advocating on behalf of a

6    foreign terrorist organization where the individual was "under the direction or control" of the

7    foreign terrorist organization, the plain text of IRTPA goes further in defining "personnel" as

8    providing "1 or more individuals . . . to work under that terrorist organization's direction or

9    control" in all circumstances, not just advocacy.

10          In their pleadings as well during oral arguments, the Government represented to the

11   Court that, as the Indictment alleges, the Government's theory at trial will be that Defendants

12   solicited donations for the MEK under the direction or control of the MEK.  Because the

13   Indictment was returned by a grand jury, the Government must prove at trial what it presented

14   to the grand jury.  *Russell v. United States*, 369 U.S. 749, 770-771 (1962) (internal citations

15   omitted).

16          Thus, the Court finds that Defendants' challenge to Counts 60-82 should be denied.

17          ***Prosecution for providing financial contributions as alleged in Counts 83-117***

18          Defendants argue that counts 83-117 are unconstitutional under *Brandenburg* because

19   the Indictment fails to allege that the financial contributions Defendants made to the MEK

20   furthered terrorist activities. The Court recognizes that this issue was not squarely presented to

21   the Ninth Circuit because, unlike the original indictment at issue in *Afshari*,  the facts alleged in

22   the Indictment could be construed to allege that the MEK engaged in advocacy that, but for its

23   designation, could have been construed as advocacy protected under the First Amendment.

24   Defendants' argument is foreclosed, however, by the same reasoning.  Even assuming that the

25   MEK is an organization whose overwhelming function was political advocacy where money

26   and the things money can buy, do indeed serve as proxy for speech and demonstrate one's

27   association with the organization," *HLP I*, 205 F.3d at 1134, if Congress can restrict

28   contributions to political organizations when it has a legitimate purpose, it may certainly

1    prohibit donations to a terrorist organization.  As the *Afshari* Court found:

2        It would be anomalous indeed that Congress could restrict the contribution of money for

3        television commercials that say why a candidate would be a good or bad choice for

4        political office, yet could not prohibit contribution of money to a foreign group that the

5        government determines engages in terrorist activities.  Defendants are entitled under the

6        First Amendment to publish articles arguing that the MEK is not really a terrorist

7        organization, but they are not entitled to furnish bombs to the MEK, nor to furnish

8        money to buy bombs and ammunition.

9    *Afshari*, 426 F.3d at 1161.

10       Furthermore, as the *HLP I* Court reasoned,

11       [M]oney is fungible; giving support intended to aid an organization's peaceful activities

12       frees up resources that can be used for terrorist acts. We will not indulge in speculation

13       about whether Congress was right to come to the conclusion that it did. We simply note

14       that Congress has the fact-finding resources to properly come to such a conclusion.

15   *HLP I*, 205 F.3d at 1136.

16       Defendants' Motion to Dismiss Counts 59-117 Pursuant to the First and Sixth

17   Amendments is therefore denied.

18   ***Defendants' Motion to Dismiss Counts 60-82 for Alleging Only Solicitation but not Material***

19   ***Support, Defendants' Motion No. 11***

20       Defendants next argue that the counts charging that Defendants provided material

21   support by soliciting funds fails to state a viable claim.  Defendants argue that "solicitation" is

22   not included in the statutory definition of material support.  Defendants argue that to the extent

23   the Government bases the solicitation counts on a theory of personnel, those counts should be

24   dismissed because the Government failed to submit those allegations to the grand jury.

25   According to Defendants, if the Government wanted to charge them "with providing

26   'personnel' to the MEK, it could have tried to do so by presenting evidence to the grand jury

27   [of] what it now claims in its opposition – that Defendants provided themselves to the MEK as

28   'personnel' and this constitutes material support."  Defendants' Reply Brief in Support of

Motion to Dismiss Counts 60-82 for Alleging Only Solicitation but not Material Support, Doc.
No. 864, at 3.

An indictment that tracks the statutory language is generally sufficient to state a claim,
but it must "be accompanied with such a statement of the facts and circumstances as will
inform the accused of the specific offense, coming under the general description with which he
is charged." *Russell,* 369 U.S. at 764-765.  Otherwise, "a defendant could then be convicted on
the basis of facts not found by, and perhaps not even presented to, the grand jury which
indicted him" in violation of the Fifth and Sixth Amendment.  *Id*. at 770.

Defendants' challenge fails because, as stated above, the Indictment alleges that
Defendants knowingly combined, conspired, and agreed to provided material support to a
foreign terrorist organization by soliciting contributions on behalf of the MEK.  Indictment ¶
69.  The Indictment alleges that Defendant Rahmani was the leader of the Los Angeles MEK
cell, and directed fund-raising activities and solicited donations for the MEK from various
individuals.  Indictment ¶ 19.  It also alleges that the fund-raising activities in the Central
District of California were organized and controlled by a Los Angeles-based designated cell
leader, that the Los Angeles cell leader received directions and guidance from the MEK about
MEK activities in the Los Angeles area, and that as the cell leader, Defendant Rahmani
communicated with MEK leadership, Indictment ¶ 35.  The Indictment further alleges that
some of the Defendants solicited donations from unwitting donors at LAX. Indictment ¶ 36.
Because the Indictment alleges sufficient facts that inform the accused of the specific offense,
coming under the general description with which they are charged, that is, providing material
support or resources to a designated FTO, the Indictment properly alleges the offense without
violating the protections afforded to Defendants by the Fifth and the Sixth Amendments.

Defendants' Motion to Dismiss Counts 60-82 for Alleging Only Solicitation but not
Material Support, Defendants' Motion No. 11, is therefore denied.

**Accordingly**,

IT IS ORDERED that Defendants' Motion to Dismiss Counts 59-117 for Violating the
*Ex Post Facto* Clause and Being a Bill of Attainder, Defendants' Motion to Dismiss No. 1,

17

1   Doc. No. 789; Defendants' Motion to Dismiss Counts 59-117 Pursuant to the First and Sixth

2   Amendments, Defendants' Motion No. 2, Doc. No. 790 and Defendants' Motion to Dismiss

3   Counts 60-82 for Alleging Only Solicitation but not Material Support, Defendants' Motion No.

4   11, Doc. No.799 are respectfully DENIED.

5   Dated: April 14, 2009.

6                                     DAVID O. CARTER

7                                     United States District Judge